UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TIMOTHY M. COHANE,

    Plaintiff,

v.                                                                                              **DECISION & ORDER**
                                                                                                        04-CV-943S

WILLIAM R. GREINER, DENNIS BLACK,
ROBERT ARKEILPANE,
WILLIAM MAHER, ERIC EISENBERG,
MID-AMERICAN CONFERENCE, and
ROBERT FOURNIER,

    Defendants.

## I.  INTRODUCTION

In this case, Plaintiff Timothy Cohane, a former basketball coach at the State University of New York at Buffalo ("SUNY Buffalo"), alleges that Defendants violated his right to due process by proffering fraudulent testimony and withholding exculpatory evidence from the NCAA.  As a result, Plaintiff alleges, the NCAA banned him from coaching for four years and destroyed his reputation and career.  Plaintiff seeks relief pursuant to 42 U.S.C. § 1983.  Currently before this Court is the SUNY Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.  BACKGROUND

**A.  Facts**

The following facts, which are alleged in the Complaint, are assumed true for purposes of the instant motion. Cohane served as head coach of the men's intercollegiate National Collegiate Athletic Association ("NCAA") Division I basketball team at SUNY Buffalo from 1993 through December 3, 1999.  (Am. Compl., ¶ 5).  After SUNY Buffalo

1

hired Cohane as the head coach of its men's basketball team in 1993, the team progressed from an NCAA team without a league, to the East Coast Conference, and finally to the Mid American Conference ("the MAC"). (Am. Compl., ¶ 30). The MAC, one of 34 conferences within the NCAA, regulates and manages the men's basketball program at SUNY Buffalo. (Am. Compl., ¶¶ 13, 30).

In 1998, Defendant Robert Arkeilpane assumed the position as SUNY's Director of Athletics. (Am. Compl., ¶ 31). After Cohane publicly protested the removal of a fellow coach that year, Arkeilpane became consumed with having Cohane fired. (Am. Compl., ¶¶ 32, 33, 42). Despite Arkeilpane's obvious bias against Cohane, on January 29, 1999, SUNY Buffalo approved an extension of Cohane's contract through April 13, 2002. (Am. Compl., ¶ 39). Arkeilpane refused Cohane's request to make a public announcement of the extension, as was customary, and he instructed a sports writer from the Buffalo News not to print the news that Cohane's contract had been extended. (Am. Compl., ¶¶ 42, 48). Thereafter, Arkeilpane took steps to "make Cohane sweat," by freezing the men's basketball recruiting budget, unilaterally changing scheduled games, improperly authorizing payment of medical bills for a student athlete, and by requiring Cohane to report to SUNY's Assistant Athletic Director Bill Maher. (Am. Compl, ¶¶ 43-49).

Arkeilpane enjoyed a pre-existing friendship and business relationship with Rob Fournier, the then-Director of Compliance for the MAC. (Am. Compl., ¶ 52). On August 4, 1999, without notice to Cohane, Arkeilpane wrote a letter to the MAC on behalf of SUNY Buffalo, in which he requested Fournier's assistance resolving "alleged violations by our men's basketball team program . . . ." (Am. Compl., ¶ 62). Fournier wrote a letter to the NCAA dated August 9, 1999, wherein he confirmed that he had called the NCAA on August 3, 1999, concerning an alleged infraction and "documentation offered by the

2

school." (Am Compl., ¶ 64). Specifically, the letter stated as follows:

> "As a consequence of the sensitive personal and private issues to be protected, the Conference will undertake this process in the coming weeks by submitting affidavits, interviewing affected parties, and insuring due process . . . . Toward that end, we will utilize when necessary the full services and cooperation of personnel at the University at Buffalo including New York State legal counsel."

(Am. Compl., ¶ 66).

From August 1999 through February 9, 2001, the MAC fully utilized the services of SUNY personnel, including those of Arkeilpane, Maher, Eric "Rock" Eisenberg, the assistant men's basketball coach, SUNY President William Greiner, and Vice President Dennis Black, Esq. (collectively "the SUNY Defendants"). (Am. Compl., ¶¶ 6, 7, 10 & 67). According to Cohane, the SUNY Defendants authorized, assisted and conspired with Fournier to violate his due process rights as well as the protocols and rules promulgated by the NCAA and MAC. (Am Compl., ¶ 68). Specifically, with the consent of the SUNY Defendants, Fournier conducted interviews without tape recording them, as required, prepared affidavits for adverse witnesses, intimidated witnesses into giving damaging testimony against Cohane, misrepresented himself to potential witnesses by claiming that he was an attorney or an employee of SUNY Buffalo, and refused Cohane's request for information regarding the nature of charges against him or documentation of his alleged infractions. (Am. Compl., ¶¶ 69, 70, 73, 74, 75, 77, 78).

In September of 1999, Arkeilpane interviewed the student athletes on the SUNY Buffalo basketball team, many of whom made statements which exonerated Cohane of violating NCAA rules and regulations. (Am. Compl., ¶ 79-80). From September 1999 through January 2000, Arkeilpane, Maher and Fournier threatened student athletes with

loss of their scholarships and NCAA eligibility, as well as forfeiture of their degrees, to compel them to change their testimony and sign false affidavits implicating Cohane. (Am. Compl., ¶¶ 81-84). At all times, the sum and substance of the students' taped statements and the existence of the conflicting affidavits were intentionally withheld from Cohane. (Am. Compl., ¶¶ 80, 84).

During the investigation, Eisenberg, the assistant coach, began soliciting student athletes and members of Cohane's coaching staff to support him in his bid to become the "next head coach." (Am Compl., ¶ 89). In November 1999, Eisenberg submitted to Maher a copy of scouting notes, which Defendants falsely claimed were distributed to the basketball team in violation of NCAA regulations. (Am Compl., ¶¶ 100-01).

On November 16, 1999, the MAC issued a draft report, which set forth a list of allegations against Cohane but omitted exculpatory information. (Am Compl., ¶ 99). Despite numerous requests from Cohane, the SUNY Defendants never provided him with affidavits supporting the draft report. (Am Compl., ¶¶ 102-03, 110). On December 1, 1999, Greiner and Arkeilpane wrote to Fournier and the MAC that SUNY Buffalo "accept[ed] the report (Fournier's report) and acknowledg[ed] the findings therein." (Am Compl., ¶ 108). That same day, Greiner dispatched a uniformed police officer to deliver to Cohane's home at 8 a.m. a letter suspending him without pay and declaring him a *persona non grata* on the SUNY campus. (Am. Compl., ¶ 109).

On December 3, 1999, Cohane was forced to resign his position at SUNY Buffalo. (Am Compl., ¶ 110). SUNY Buffalo released Cohane from liability for any actions or omissions which occurred prior to October 3, 1999. (Compl., ¶¶ 28, 64). Notwithstanding the release, SUNY Buffalo issued a statement to the press on December 9, 1999,

4

accepting the MAC's findings against Cohane. (Am Compl., ¶ 128).

On December 8, 1999, after Cohane's resignation, Maher told the men's basketball team that "they had one more chance" to change their affidavits and if they did not tell the truth, they would lose their scholarships and NCAA eligibility. (Am Compl., ¶ 119). Maher also held individual meetings with at least 5 student athletes who had refuted the allegations against Cohane in the past. (Am Compl., ¶ 131). Under duress, three student athletes agreed to change their prior sworn affidavits, which exonerated Cohane. (Am Compl., ¶¶ 120-22, 132). On January 16, 2000, Arkeilpane and Fournier submitted a false affidavit to the MAC Hearing Committee. (Am Compl., ¶ 123). Although Defendants Greiner, Black and Fournier each had an independent ethical duty to notify the MAC and the NCAA that the affidavit was false, each failed to do so. (Am. Compl., ¶¶ 124-25).

On December 22, 1999, Fournier wrote to Greiner and Arkeilpane that although characterized as a resignation, Cohane's departure or the "change in leadership" constituted an "institutional response to this investigation." (Am Compl., ¶ 133).

Around January 10, 2000, Maher advised the SUNY basketball team in both collective and individual meetings that if they signed affidavits for Cohane, they would face serious consequences and would not be able to graduate. (Am. Compl., ¶¶ 135-36). Between January 16, and 18, 2000, the MAC Infractions Committee held a hearing at which representatives of the MAC schools judged Fournier's investigation and report. (Am. Compl., ¶ 137). Arkeilpane, Maher and Black participated in Fournier's case against Cohane, which included the presentation of false affidavits and other evidence Cohane never had an opportunity to examine. (Am Compl., ¶¶ 137, 139-40). Much of the MAC hearing was conducted in Cohane's absence, while Maher, Arkeilpane, Black and Fournier remained. (Am Compl., ¶ 144). Over the eleven months following the MAC investigation,

Cohane learned that four witnesses had not signed affidavits, six witnesses had no supporting tape recordings, six witnesses were coerced to sign affidavits against Cohane, nine of the affidavits contained statements that conflicted with tape-recorded interviews, and that the SUNY Defendants concealed all of this from the MAC Infractions Committee. (Am Compl., ¶ 141).

On January 18, 2000, the MAC Infractions Committee voted to adopt the findings in Fournier's report and forwarded the matter to the NCAA for further action against Cohane. (Am Compl., ¶ 146). Between the MAC hearing in January 2000 and the NCAA hearing in February 2001, the SUNY Defendants denied Cohane access to records that would have exonerated him. (Am Compl., ¶ 148).

In the Spring of 2000, some student athletes who had exhausted their NCAA eligibility refused to interview with NCAA enforcement staff. (Am Compl., ¶ 149). In response, Arkeilpane and Maher threatened the students that their degrees would not be issued if they did not cooperate in the investigation. (Am Compl., ¶ 149).

In January 2001, in response to the official NCAA inquiry, SUNY Buffalo failed to disclose the existence of exculpatory information or the identity of potential witnesses with such information, or to advise the conference about the conflicting affidavits. (Am. Compl., ¶ 151). At the NCAA hearing on February 9, 2001, Defendants permitted false affidavits to be presented as evidence, knowingly gave false and misleading testimony and withheld exculpating evidence and witnesses. (Am Compl., ¶ 152). As a consequence, the NCAA banned Cohane from coaching for four years, thereby destroying his coaching career and professional reputation. (Am Compl., ¶ 153). Moreover, the stigmatizing charges are part of Cohane's personnel file maintained by SUNY Buffalo, which has been disclosed and is likely to be disclosed to any prospective employers. (Am. Compl., ¶ 158).

6

**B.     Procedural Background**

Plaintiff commenced this case by filing a Complaint in the United States District Court for the Eastern District of New York on January 17, 2003. On October 28, 2003, the NCAA Defendants filed a Motion to Dismiss for Improper Venue. Thereafter, on October 1, 2004, the SUNY Defendants filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] By Memorandum and Order entered on November 23, 2004, United States District Judge Sterling Johnson, Jr., denied the NCAA Defendants' Motion to Dismiss based on improper venue and transferred this case to the United States District Court for the Western District of New York.

## III.  DISCUSSION

**A.     Motion to Dismiss Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12 (b)(6). When resolving a motion to dismiss under Rule 12(b)(6), a court must accept the factual allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-moving party. Still v. DeBuono, 101 F.3d 888, 891 (2d Cir. 1996); see also Press v. Quick & Reilly, Inc., 218 F.3d 121, 128 (2d Cir. 2000) (noting that factual allegations in the complaint must be accepted as true on a motion to dismiss). Moreover, a complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957)).

---

[1] In support of their motion, the SUNY Defendants filed a memorandum of law with exhibits and a reply memorandum of law. Plaintiff filed a memorandum of law in opposition.

To survive a motion to dismiss, a plaintiff must assert a cognizable claim and allege facts that, if true, would support such a claim. See Boddie v. Schnieder, 105 F.3d 857, 860 (2d Cir. 1997). At the same time, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to survive a motion to dismiss." Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir. 2002) (internal citations omitted). Ultimately, in the context of such a motion, "[t]he issue is not whether a plaintiff will or might ultimately prevail on her claim, but whether [he] is entitled to offer evidence in support of the allegations in the complaint." Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll., 128 F.3d 59, 62 (2d Cir. 1997) (citation omitted).

**B.     The SUNY Defendants' Motion to Dismiss**

Plaintiff asserts a single cause of action against the SUNY Defendants under 42 U.S.C. § 1983. Specifically, Plaintiff alleges that the SUNY Defendants violated his constitutional right to due process by proffering fraudulent testimony and withholding exculpatory evidence from the NCAA. As a consequence, Plaintiff alleges, the NCAA banned him from coaching for 4 years and thereby destroyed his career and reputation.

In its Motion to Dismiss, the SUNY Defendants argue that their post-termination conduct did not violate Cohane's constitutional rights.[2] In particular, the SUNY Defendants

---

[2]     In its Memorandum, the SUNY Defendants also argued that any claim relating to Plaintiff's forced resignation is time-barred, that his termination-based due process claim fails because due process was available through an Article 78 proceeding, and that any claim based on actions taken before December 3, 1999, are barred by mutual release. However, Plaintiff's response made clear that his Section 1983 claim is not predicated on his forced resignation, but rather upon the SUNY Defendant's post-termination conduct. (Pl.'s Mem., p. 5). For example, Plaintiff cites to the Amended Complaint, which states, "*[n]otwithstanding plaintiff's forced resignation*, the named defendants engaged in a pattern of continuous wrongful conduct and actions against Cohane including, but not limited to, threatening students with the loss of their scholarship and eligibility and loss of degree if any of them attempted to support Cohane in defending himself in the MAC investigation." (Am. Compl., ¶ 112) (emphasis added).

However, Cohane does cite to certain time barred events – including the loss of his job – to provide context for his claim and to prove that the SUNY Defendants' post-termination conduct violated his due process rights. This Court construes Plaintiff's response as a concession that the loss of his job is something for which he cannot seek redress. Presuming this concession, the SUNY Defendants have withdrawn their timeliness arguments, and have conceded that their Article 78 argument is moot.

8

argue that: (1) the alleged defamatory statements constitute simple defamation, and are not actionable under 42 U.S.C. § 1983; (2) it was the MAC and the NCAA, and not the SUNY Defendants, that imposed sanctions on Cohane; and (3) they were not acting under color of state law when they made the alleged defamatory statements. For the following reasons, the SUNY Defendants' Motion is denied.

### 1.    42 U.S.C. § 1983

Civil liability is imposed under 42 U.S.C. § 1983 only upon persons who, acting under color of state law, deprive an individual of rights, privileges, or immunities secured by the Constitution and laws. See 42 U.S.C. § 1983; Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 137 (2d Cir. 1999). On its own, Section 1983 does not provide a source of substantive rights, but rather, provides a method for vindicating federal rights conferred elsewhere in the federal statutes and the Constitution. See Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 1870, 104 L. Ed. 2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 2695, 61 L. Ed. 2d 433 (1979)). Accordingly, in reviewing claims brought pursuant to Section 1983, it is necessary to precisely identify the constitutional violations alleged. See Baker, 443 U.S. at 140. Here, Cohane's claim is that the SUNY Defendants acted jointly with Fournier and the MAC to violate his right to due process under the Fourteenth Amendment.

The Fourteenth Amendment provides, in pertinent part, that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV. There are two broad categories of due process claims — substantive and procedural. A substantive due process claim is based upon the deprivation of a

---

Accordingly, this Court need only address the SUNY Defendants' arguments relating to their post-termination conduct.

9

constitutionally protected life, liberty, or property interest. See B.D. v. DeBuono, 130 F. Supp. 2d 401, 431 (S.D.N.Y. 2000). A procedural due process violation occurs when the Government deprives a person of a protected life, liberty, or property interest without first providing that person with notice and an opportunity to be heard. Id. at 432-33.

### 2. Stigma-Plus Requirement

A protectible liberty interest may be implicated "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S. Ct. 507, 510, 27 L. Ed. 2d 515 (1971). However, damage to one's reputation, standing alone, is insufficient to "invoke the procedural protection of the Due Process Clause." Paul v. Davis, 424 U.S. 693, 701, 96 S. Ct. 1155, 1161, 47 L. Ed. 2d 405 (1976). Rather, "loss of reputation must be coupled with some other tangible element in order to rise to the level of a protectible liberty interest." Valmonte v. Bane, 18 F.3d 992, 999 (2d Cir. 1994).

"This test for liberty interest claims stemming from alleged government defamation is commonly referred to as the 'stigma plus' test." Greenwood v. New York, Office of Mental Health, 163 F.3d 119, 124 (2d Cir. 1998) (citing Neu v. Corcoran, 869 F.2d 662, 667 (2d Cir. 1989)). To satisfy the "stigma plus" test, a plaintiff must allege two elements: "the utterance of a 'statement sufficiently derogatory to injure his reputation' that is capable of being proved false" and "a material, state-imposed burden or state-imposed alteration of the plaintiff's status or rights." Anemone v. Metropolitan Transp. Auth., – F. Supp. 2d –, 2006 WL 164910, at *8 (S.D.N.Y. Jan. 24, 2006) (quoting Sadallah v. City of Utica, 383 F.3d 34, 38 (2d Cir. 2004)).

The SUNY Defendants concede that for purposes of the instant motion, stigma has

been satisfied.  (Defs' Mem., p. 9).  Notwithstanding Defendants' concession, there can be no dispute that the alleged statements charging Cohane with various NCAA violations call into question his "good name, reputation, honor, or integrity."  Patterson v. City of Utica, 370 F.3d 322, 330 (2d Cir. 2004) (quoting Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 446 (2d Cir. 1980)).  Cohane alleges that potential employers have access to his personnel record, which includes the defamatory charges.  As the Second Circuit held in Brandt v. Bd. of Cooperative Educ. Servs., 820 F.2d 41, 45 (2d Cir. 1987), if a Plaintiff is "able to show that prospective employers are likely to gain access to his personnel file and decide not to hire him, then the presence of the charges in his file has a damaging effect on his future job opportunities."  See also Valmonte, 18 F.3d at 1000 (stating that "[d]issemination to potential employers . . . is the precise conduct that gives rise to stigmatization").[3]  Under Brandt, Cohane's allegation that employers have access to his personnel file satisfies the stigma requirement.

Because Cohane has sufficiently alleged the defamation prong of the "stigma plus" test, this Court must now determine whether the "plus" part of the test is met.  It is well settled that the "plus" must be something distinct from the "deleterious effects [flowing] directly from a sullied reputation."  Valmonte, 18 F.3d at 1001; see also Cassidy v. Scoppetta, 365 F. Supp. 2d 283, 289 n.10 (E.D.N.Y. 2005) (holding that "the 'stigma' and the 'plus' must be two distinct things").  Put another way, defamation "must be accompanied by some significant deprivation, such as dismissal from public employment,"

---

[3] In the Second Circuit, a plaintiff need not wait until he actually loses some job opportunity "because the presence of the charges in his personnel file coupled with a likelihood of harmful disclosure already place him 'between the devil and the deep blue sea.'" Brandt, 820 F.2d at 45 (internal citations omitted). That is, a potential employer will likely refuse to hire him if he authorizes the release of his personnel file, and the damaging charges therein, or if he refuses to authorize the release of his personnel file. Id.

11

O'Neill v. City of Auburn, 23 F.3d 685, 6911 n.2 (2d Cir. 1994), or "termination of some other legal right or status." Neu, 869 F.2d at 667. This Court finds that Cohane's four year suspension from the NCAA and his marred personnel record place a tangible burden on his employment prospects. Valmonte, 18 F.3d at 1001. This burden constitutes a deprivation of Cohane's liberty interest and satisfies the "plus" requirement.[4]

### 3. Proximity Between Stigma and Plus

Defendants argue that it was the MAC and the NCAA, and not SUNY, that imposed sanctions on Cohane, and therefore, that his "stigma plus" claim fails. This Court does not agree. "Although the 'stigma' and the 'plus' typically will originate with the same state actor, 'perfect parity in the origin of both the 'stigma' and the 'plus' is not required' as long as the 'stigma' and 'plus' are 'sufficiently proximate.'" Anemone – F. Supp. 2d –, 2006 WL 164910, at *9 (quoting Velez v. Levy, 401 F.3d 75, 89 (2d Cir. 2005)). Proximity is satisfied where: "(1) the stigma and plus would, to a reasonable observer, appear connected - for example, due to their order of occurrence, or their origin - and (2) the actor imposing the plus adopted (explicitly or implicitly) those statements in doing so." Velez, 401 F.3d at 89 (internal citations omitted).

Here, Cohane adequately alleges the "stigma plus" injury needed to ground a liberty deprivation claim. Cohane asserts that the SUNY Defendants, and Akeilpane in particular, solicited the MAC to investigate fraudulent allegations against him, coerced false testimony from student athletes, and presented perjured testimony to the MAC and the NCAA. Cohane alleges that in suspending him, the NCAA expressly adopted Fournier's report,

---

[4] Liberty denotes "not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge . . . and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." Meyer v. Nebraska, 262 U.S. 390, 399, 43 S. Ct. 625, 626, 67 L. Ed. 1042, 1045 (1923).

which was based on perjured testimony suborned by the SUNY Defendants.  In essence, Cohane alleges that the SUNY Defendants imposed a "stigma" and compelled the NCAA to impose the "plus."  Cohane alleges that the SUNY Defendants interfered with the MAC and the NCAA investigation and proceedings so completely that it was impossible for him to vindicate himself.  Taking these allegations as true, this Court finds that the SUNY Defendants' conduct implicates a "stigma-plus" liberty interest, and that the Amended Complaint adequately asserts the deprivation of that interest.  The question of who, if anyone, may be liable for the deprivation of that interest is left for another day.  Velez, 401 F.3d at 90.

### 4.  State Action Requirement

Lastly, the SUNY Defendants argue that they did not act under color of state law in providing allegedly false and misleading information to the MAC and the NCAA.  Again, this Court disagrees.  The fundamental purpose of Section 1983 is "to provide compensatory relief to those deprived of their federal rights by state actors."  Kia P. v. McIntyre, 235 F.3d 749, 755 (2d Cir. 2000) (quoting Felder v. Casey, 487 U.S. 131, 141, 108 S. Ct. 2302, 2308, 101 L. Ed. 2d 123 (1988)).  Accordingly, a court assessing the viability of a Section 1983 claim must determine whether the actions alleged were committed under color of state law.  Carlos v. Santos, 123 F.3d 61, 65 (2d Cir. 1997).  "The traditional definition of acting under color of state law requires that the defendant in a [Section] 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  Kern v. City of Rochester, 93 F.3d 38, 43 (2d Cir. 1996) (quoting West v. Atkins, 487 U.S. 42, 49, 108 S. Ct. 2250, 2255, 101 L. Ed. 2d 40 (1988)).

In the instant case, Cohane alleges that the SUNY Defendants coerced false

13

testimony from student athletes through threats of revoking their scholarships and NCAA eligibility, and of withholding their degrees. Moreover, Cohane alleges that the SUNY Defendants solicited the MAC to investigate him, suborned perjury and presented false evidence to the MAC and the NCAA, and withheld exculpatory evidence from those entities. Clearly, these acts were made possible because the SUNY Defendants were state school officials and employees clothed in the authority of state law. Accordingly, this Court finds that Cohane has stated a viable claim under Section 1983.

## IV.  CONCLUSION

For the foregoing reasons, this Court finds that the Amended Complaint adequately alleges a "stigma plus" injury for purposes of 42 U.S.C. § 1983, and that the actions alleged were committed under color of state law. Accordingly, the SUNY Defendants' Motion to Dismiss is denied.

## V.  ORDERS

IT HEREBY IS ORDERED that the SUNY Defendants' Motion to Dismiss (Docket No. 52, Exh. 6)[5] is DENIED.


SO ORDERED.

Dated:     March 10, 2006
           Buffalo, New York

                                        /s/William M. Skretny
                                        WILLIAM M. SKRETNY
                                        United States District Judge

---

[5] This case was transferred from the United States District Court for the Eastern District of New York *after* the SUNY Defendants filed the instant motion. As a result, the SUNY Defendants' motion does not have a separate or dedicated number on the docket maintained by this Court. Rather, it is designated on this Court's docket as Exhibit Docket No. 39, which appears at Docket No. 52, Exhibit 6.